## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 11-80589-Civ-SCOLA

**ROBERT JOSEPH HENDERSON,**

     **Plaintiff,**

**vs.**

**ROBERT DEMARS and**
**ROBERT DEMARS, LTD.**

     **Defendants.**

_____/

### COURT'S FINDINGS OF FACT AND CONLUSIONS
### OF LAW FOLLOWING NON-JURY TRIAL

**THIS MATTER** was heard by the Court on March 18, 2013 and March 19, 2013 for a non-jury trial. After considering the credible evidence and testimony and argument of counsel, the Court makes the following factual findings and legal rulings:

### OVERVIEW OF THE CASE

*The Plaintiff's Claims:*

The Plaintiff, Robert Joseph Henderson ("Henderson") alleged that in February 2007 he decided to begin collecting classic automobiles. Henderson saw an advertisement placed by the Defendant, Robert Demars ("Demars"), in *Hemmings Motor News,* a magazine catering to automobile collectors and enthusiasts. According to Henderson, in his advertisement and website, Demars presented himself as "the world's best known auto appraiser" and made numerous representations as to his skill, expertise and diligence in appraisal, inspection and diagnosis of classic autos for potential buyers.

Henderson contacted Demars to assist him in finding and evaluating cars for his collection. Henderson claims that Demars thereafter sent him additional materials touting his ability to inspect and appraise classic autos. In all of the advertisements Demars indicated that

the services would be provided by "Robert Demars, LTD."    Henderson claims that no such corporate entity ever existed and that this was an unregistered fictitious name used by Demars.

Henderson executed an AutoSearch Agreement (the "Contract") and provided Demars with a retainer to begin searching for autos.  The Contract provided for a "Declining Fee Scale" in which Demars would be compensated a certain percentage of the negotiated purchase price of cars he had located and recommended.

## 1974 Ferrari Dino GTS

In May 2007, Demars located and had inspected for Henderson a 1974 Ferrari Dino GTS. Demars told Henderson the car was in "time capsule" condition and was "one of a kind" and in "all original condition," including the original "fly yellow" paint.

Based upon Demars's recommendation, Henderson purchased the car from Edmund Waterman for $205,000 and paid Demars a commission of $19,400.  Demars, as part of his services, appraised the retail value of the Dino at $300,000.

Two years later, Henderson decided to sell the Dino through a North Carolina classic car dealer, Kenneth Sterne ("Sterne").   After inspecting the car and researching its history, Sterne determined that the car had been repainted on two occasions and its original color was blue – not "fly yellow" as represented by Demars.  Sterne also located the original owners of the Dino and confirmed that the car was originally painted blue.

## 1973 Ferrari 250 GT Lusso

In June 2007, Demars identified a 1963 Ferrari 250 GT Lusso located in Boca Raton, Florida for potential purchase by Henderson.  Demars told Henderson that the car contained the original engine.  Based upon Demars's recommendation, Henderson purchased the car for $485,000.  Demars was paid a commission of $41,000.  Demars provided Henderson with an appraised retail value for the Lusso of $650,000.

Three years later, Henderson decided to sell the Lusso to Andy Cohen ("Cohen") of Beverly Hills Sports and Classic Cars.  Henderson shipped the Lusso from North Carolina to California where Cohen made a visual inspection of the car upon its arrival.  Cohen noticed

unusual stampings on the engine block which led him to perform additional research of the car's history.  Cohen concluded that the engine in the Lusso was a counterfeit.

In this lawsuit, Henderson claims that Demars breached the terms of the Contract by failing to properly inspect, diagnose and determine the accurate history of the cars.  Henderson claims the original color of the Dino and the re-stamping of the Lusso would have been easily detected by a knowledgeable auto appraiser.

Henderson further claims that Demars violated the Florida Deceptive and Unfair Trade Practices Act (FDUPTA) by making several deceptive representations in his advertising, his website and directly to Henderson concerning his expertise.  Henderson also claims that Demars told him that Waterman (the owner of the Dino) had represented to Demars that the vehicle was in its original condition and that Henderson would lose the car if he did not purchase it immediately because there were other buyers interested in purchasing it.  Waterman never made such representations to Demars.

Henderson seeks actual damages of $19,400 for the Dino and $41,800 for the Lusso which constitute the commissions paid to Demars.  Henderson seeks consequential damages based upon the breach of the contract.  Henderson claims that the purchase price paid by him for both the Dino and the Lusso were overinflated by 15% based upon the lack of original paint and color of the Dino and the presence of a re-stamped, counterfeit engine in the Lusso.

Henderson also seeks attorney's fee pursuant to both the attorney's fee provision of the Contract and as the prevailing party under his FDUPTA claim.

### The Defendant's Claims:

Demars does not deny the existence of the Contract.  Nor does he deny locating the Dino and Lusso and appraising the vehicles for Henderson.  Demars claims that the Dino and Lusso were not the only two cars purchased by Henderson with Demars's assistance.  Demars assisted Henderson in purchasing other cars which were later sold by Henderson for a profit.

According to Demars, experts were used to inspect the vehicles and their findings were shared with Henderson before the purchases.  Henderson is an expert businessman who has purchased and sold classic cars before his relationship with Demars.

Demars claims that both the Dino and Lusso were purchased "as is" and that no guarantees were made to Henderson.

Demars also claims that Henderson's use of the vehicles in the years prior to their sale by him diminished the value of the vehicles and that Henderson decided to sell the vehicles in a bad sales market and did not use best efforts or appropriate methods to sell the vehicles.

Demars denies breaching the terms of the Contract and denies engaging in any deceptive or unfair practices.

## JURISDICTION AND VENUE

The Plaintiff, Henderson, is domiciled in the State of North Carolina and the Defendant, Demars, is domiciled in the State of California.  The amount in controversy, as pled, exceeds $75,000.  This Court, therefore, has jurisdiction over this action pursuant to 28 U.S.C § 1332.

At the time of the transactions between Henderson and Demars, Demars maintained an office in Boynton Beach, Palm Beach County, Florida.  Demars's inspection of the Ferrari Lusso took place in Boca Raton, Palm Beach County, Florida and the sale of the Ferrari Dino was consummated in Ft. Lauderdale, Broward County, Florida.  Therefore, venue is proper in the Southern District of Florida.


## SUMMARY OF THE TESTIMONY AND EVIDENCE

**Joseph Henderson** was called as the Plaintiff's first witness.  Henderson's domicile is in Weaverville, North Carolina.  He works as a consultant for an underground water works company.  Henderson was vice president of sales for his company for 13 years.  The company sold underground utilities, pipe, valves and fire hydrants.  The company had 300 employees.

Prior to meeting the Defendant, he had a love for old cars and bought and read *Hemmings Motor News* and *Car and Driver* magazines as a youth.  He first purchased a 1957 MGA and paid $500 but later learned that the car had the wrong engine.  That taught him a lesson to be sure not to get burned again.

In 2007, he had the financial wherewithal to purchase a classic car.  He looked in a *Hemmings Motor News* magazine and saw an ad by Demars.  He called Demars and left a message.  When Demars called him back, Henderson told Demars that he could tell by pictures that he liked the way a car looked but did not know how to determine the mechanics of cars or how to research their history or determine their authenticity.

Demars represented that he had a tremendous experience in appraising and finding the best cars.   Demars sent a letter to Henderson representing that he would act as a "detective" for Henderson and that no additional inspection/diagnosis and or appraisal fees would be necessary. Demars described the "exhausting procedure" he and his inspectors would utilize.

Demars's website states "WE ARE THE WORLD'S BEST KNOWN AUTO APPRAISERS!"

On February 2, 2007, Henderson executed an Autosearch Agreement and sent Demars a $1,000.00 retainer.  The Agreement states that Henderson agrees to pay a fee for a percentage of "the automobile(s) located and recommended by **Robert Demars, LTD**." (emphasis supplied). The Agreement also provides:   "Please **NOTE:  We take great pride in locating and recommending the quality type autos we would buy for ourselves were we under similar circumstances to those expressed by the Client/Buyer."** (emphasis supplied).

On March 7, 2007, Henderson sent Demars a list of cars he was interested in purchasing. He also told him that he wanted to be able to drive the cars a couple of thousand miles per year.

On April 8, 2007, Demars sent an email to Henderson notifying him of a 1972 Dino Spider 'Fly Yellow' that was "supposedly preserved, untouched, time capsule original.  Another follow-up email touted the car as "'Fly Yellow' and claimed spectacular original – no repaints – 'time capsule original.'"   On May 1, 2007, another email from Demars represented "ALL ORIGINAL" "original paint & color" and "no repaint" and 'totally undisturbed.'

Henderson authorized Demars to travel to Chicago to inspect the car.  On May 26, 2007, Demars sent an email that indicated "[p]aint near perfect original."

Demars sent a "Critique" of the car to Henderson which was consistent with the previous representations about the car.

On June 3, 2007, Demars sent Henderson an email in which he claimed that "[D]elay puts it in jeopardy."  Demars indicated that he could appraise the car for $275,000 to $300,000 if Henderson completed the purchase.  He noted, "[t]here are lots of refurbished, repainted, worn ones – but only one with 6,563 miles in Fly Yellow."

The purchase price had risen from $200,000 to $205,000 and Henderson balked at paying the additional monies.  Henderson was concerned about the lack of service records to verify the actual mileage of the car.  In an email to Henderson on June 4, 2007, Demars told him "[n]o one can fake patina of age and originality to one who knows what an original looked like."

In June 2007, Henderson decided to purchase the car for $205,000 and, on June 15, 2007, paid Demars a commission of $19,400.

On October 1, 2007, Demars provided Henderson with a written appraisal of the car which valued the car at $300,000.

In September 2008, Henderson learned that there was a "Dino Registry" which lists all of Ferrari Dino vehicles. He found his car listed and learned that his car had left the factory painted blue. Henderson sent an email to Demars telling him that information. Demars wrote back that not all the information in the registry was correct. Henderson wrote back and asked whether checking the registry should have been done prior to advising a client to rush into a purchase.

Eventually, on September 26, 2008, Demars acknowledged that the information in the Ferrari registry was correct. Demars apologized for not detecting the original color.

Henderson testified that had he known the car did not have the original paint of the car, he may still have purchased the car but at a much lower price. Demars's advice was critical to Henderson's decision to purchase the car.

Henderson does not believe Demars fulfilled his obligations under the Agreement. Demars did locate the car and did provide an inspection of the car but he did not verify the authenticity of the car and did not determine the value of the car. Henderson believes he suffered damages by paying more for the car than it was worth and by paying Demars a commission for the car.

Henderson also purchased a Ferrari Lusso through Demars. In late Spring or early summer 2007, Demars sent Henderson an email notifying him about the availability of a Ferrari Lusso. The car was in a private collection and not listed for sale. On June 15, 2007, Demars sent a Critique of the Lusso to Henderson that indicated the car had its original engine. A revised critique indicated that the engine number was a "match." Demars included an Inspection Certification which certified the accuracy of his Critique.

Henderson purchased the Lusso for $485,000 on June 21, 2007. Demars indicated that the price was fair and if they offered less money, someone else would buy the car. Henderson paid Demars a commission of $41,800 on June 23, 2007. On September 30, 2007, Demars provided an appraisal of the Lusso to Henderson in which he appraised the car for $650,000.

In 2009, Henderson placed an ad in *Hemmings* for the car listing it for $650,000 and ran the ad for six months, but there was very little interest in the car. At the end of the six months,

Henderson communicated with Andy Cohen of Beverly Hills Motors with whom Henderson had transacted previously.  Henderson learned that the engine of the Lusso may not have been the original engine.

Henderson then contacted Demars by email on August 2, 2010 and complained that he had employed Demars to avoid situations like this and now he had the color change in the Dino and the engine issue with the Lusso.

Demars responded to Henderson on August 3, 2010 in which he explained that the term "matching" engine does not  mean "original" engine and such is understood in the industry.  However, Henderson testified that Demars informed him prior to the purchase that "matching" engine meant "original" engine.  Demars goes on to tell Henderson that by conducting his own research into his vehicle it could actually work against his best interest by finding out disappointing information he might prefer not to know.  After a series of emails, Demars wrote to Henderson asking him to drop his "vendetta" and threatening to report Henderson to the IRS if he did not.      Henderson ultimately sold the Lusso for $400,000.

Henderson would not have purchased the Lusso for the price he paid if he had known it was not an original engine.  His decision to purchase was 100% based upon Demars's recommendation and advice.  He would not have hired Demars if he had known Demars would not provide the services promised to him.  Henderson was damaged by overpaying for the Lusso and by paying Demars his commission.

Henderson purchased $1.7 million of vehicles using Demars.  He no longer owns any of those cars but does own several other classic cars.  In 2009, Henderson bought a Lamborghini utilizing Demars.  He paid $567,000 and later sold it for $900.000.  After paying commissions and other expenses, Henderson earned a profit of approximately $250,000.  Henderson claims that although Demars was involved in that purchase, Henderson relied more on, and dealt more with, Andy Cohen.

**Robert Demars** was called as the Plaintiff's next witness.  Demars's domicile is in California, but in May and June 2007 he lived in, and had his office in, Palm Beach County, Florida.

Demars acknowledged that his website was put together by him about 10 years ago and the content of the website has not changed.  The website's very first line states: **"The World's Best Known Auto Appraisers.''**  Demars began appraising collector cars in the 1960's at a time

when there were no auto appraisers for exotic collector cars.  He testified that "people started asking me for my autograph.  I realized I was terribly well-known after running my ads for many years in *Hemmings Motor News* and declared it."

Demars admitted that Robert Demars LTD. is a fictitious name that he came up with because he liked the sound of it but it is not a registered entity.

Demars relies on other knowledgeable persons in the industry to conduct inspections of vehicles for him, particularly if the cars are located far from him.  Mr. Da Silva in Chicago has inspected many cars on behalf of Demars.

Demars admitted it is common in the industry to hide facts about a car and it is important to hire someone like him to unearth those facts.

Demars looks in every crevice of a car with a flashlight and gets as much information as possible without dismantling the cars.  He indicated that there are cars that can be faked by clever artists in the auto industry that are just as clever as the artists who make copies of the Mona Lisa.

Demars's first email response to Henderson included language that our "INSPECTION-DIAGNOSIS and/or APPRAISAL will include not only the vehicle's '**Wholesale and retail NOW values'** – but **a bottom line RECOMMENDATION of the VEHICLES ACTUAL CONDITION & MILEAGE** under that shiny paint (including everything found WRONG)." (Emphasis supplied).

Demars sent an email to Henderson on April 18, 2007 in which he informed Henderson he had found a Dino Spider 'Fly Yellow' that was supposedly time capsule original.  According to Demars, "time capsule original" means as close to undisturbed factory original as possible.

Demars learned that Don Williams of Black Hawk Collection had owned the car and he was one of the wealthiest, most prestigious owners of classification and collector cars in the country.

In order to verify that this was a "time capsule" car, he spoke only to Ed Waterman from the Motor Car Gallery in Fort Lauderdale who was representing the seller of the car.  Demars could not research any of the history of the car because of the time deadlines.  "I'm not going to dig into a lot of research on a car from sources unknown at this time."  Significantly, Demars did no other research to determine whether the car was in "time capsule" condition.  According to Demars, Waterman was instrumental in convincing Don Williams to sell the car.  Waterman

specifically told Demars that the original color was Fly Yellow and that the car had its original paint.

Demars wrote an email to Henderson on May 1, 2007 indicating that the Dino was a "survivor" meaning that it was not "one of 100 or one of 1000 made – because they still show their factory built quality and construction… Since they are, in almost, as new condition, they become 'one of a kind' cars."

Demars sent an email to Henderson on May 26, 2007 telling him that "it's been reported that another party has been there and could beat us to the deal." Demars testified that Waterman provided him with information that someone else may have been interested in the car.

In another email to Henderson on May 26, 2007, Demars indicated that "[p]aint near perfect original." He also indicated that the car was originally sold by a Miami dealer to James Crosby of Plantation, Florida.

DaSilva performed the inspection of the car on behalf of Demars. Demars had wanted the car to be lifted on a hoist but the dealer had the car on the showroom floor and it could not be lifted. Nonetheless, DaSilva had plenty of time to complete a full inspection and even performed a road test of the car.

Although Demars continuously referred to the car as a "time capsule original" and "survivor" to Henderson prior to the purchase, he now claims the car was a "partial time capsule original" and a "partial survivor." Demars previously testified in his deposition that once a car is repainted it can never be considered a factory original. At trial, he refused to acknowledge that a repainted car is "no longer factory original." He tried to diminish the importance of repainting by categorizing a repainted car as "no longer factory original paint."

On September 26, 2008, Demars wrote an email to Henderson after Henderson provided him with information about the Dino having originally been painted blue. By contacting Waterman, Demars was then able to locate one of the previous owners, Bill Locke, who confirmed the car had been blue when he owned it and that he had sold the car to an attorney named Al Loson in Chicago who decided to repaint it to Fly Yellow.

Demars was unaware of the existence of the Dino Registry at the time. He had at times been a subscriber to the Ferrari market letter. Through that service you can obtain information about a car including all of the advertisements involving a car. All cars advertised in the Ferrari

market letter must include its VIN number and those advertisements are available to subscribers of the Ferrari market letter.

In June 2007, Demars notified Henderson of a Ferrari Lusso that was available for $450,000.  Steve McQueen's estate was going to sell another Lusso for several million dollars which many believe would increase the value of all Lusso's.  According the Demars, Henderson called and said, "[D]rop your standards and get me any Lusso that I can get my hands on as long as I can drive it."  Demars personally inspected the car but was only allowed 30 minutes to conduct the inspection.  He later was able to inspect it for a second time for one hour.

Demars's inspection revealed that the numbers stamped on the engine block matched the number from other paperwork but he admitted that many  times those numbers are changed by dealers and others and do not establish that the engine is an original engine.  None of Demars's written communications with Henderson informed him that the fact the engine numbers were a "match" did not necessarily mean the engine was "original."  But, Demars claims that in many verbal conversations with Henderson, he informed him that a "match" does not mean "original."  In the "Engine" section of Demars's Field Appraisal Report of the Lusso dated June 15, 2007, the box indicating "Match?" is checked and the box indicating "Original" is marked "Yes."  In his Appraisal dated September 30, 2007, Demars indicated the engine number was a "match" and was "believed original."

The engine that was actually in the Lusso is from another, more prevalent model of Ferrari and its presence in the Lusso diminished the value by $50,000.  Demars testified a car without its original engine may have a diminished value of 10 – 20%.  For a purchase price of $485,000, having an engine that was not original could diminish the value between $48,500 and $97,000.

Demars testified that finding a Lusso at that time was "unobtainable."  Demars was unaware that the car had been advertised for approximately 6 months prior to Demars's locating the car.

Before Henderson purchased the Lusso, Demars claims he had no time to do any research about the car.

Demars claims that even if he had known that the engine had been re-stamped and was no original, he would have still recommended that Henderson purchase the Lusso for $485,000.

If Henderson had contacted Demars in 2010 concerning his desire to sell the Dino and/or Lusso, Demars would have placed the Dino at auction in either Pebble Beach or Amelia Island where there are thousands of potential buyers.  He would not have placed them for sale at a dealership in Asheville, North Carolina or Beverly Hills, California.  But, the Dino was sold to a Sheikh from Dubai and the Lusso was sold to someone from England.

**Steven Ahlgrim** is general manager of Motor Car Gallery, an exotic car dealer in Fort Lauderdale.  He has a degree in industrial arts.  He began in the Ferrari business in 1979 at a dealership in Atlanta.  He is a member of Ferrari Club of America and is on their board and is a member of the International Committee for the Preservation of Ferrari Automobiles and is involved in setting the judging standards of Ferrari cars.  The Committee looks to preserve the original integrity of the automobile and individuals are encouraged to keep the original components as much as possible.

Ahlgrim also is involved in judging Ferraris at shows.  First, one judging looks at the component of the car to determine if it is original.  Any parts that are not original lead to deductions of points.  Once you determine if a component is an original part, you then judge the condition of that component.

Ahlgrim also writes a column for *Sports Car Market* magazine 10 to 12 times per year.  In the column, he reviews cars sold at auction and does an analysis of the history of the car and concludes whether the sales price was too high, too low or appropriate.

Ahlgrim was retained by the Plaintiff as his expert.  He had never met Henderson prior to this case.  He had met Demars in the showroom of his dealership.

Ahlgrim reviewed the depositions in the case, the appraisals done by Demars, photographs of the car and did his own research by contacting his Ferrari sources.  He started his research by consulting the Ferrari Market Letter.  The author of the Letter started collecting all advertisements for Ferraris and compiled a database that includes all information about individual Ferraris using the VIN number.  If one subscribes to the Ferrari Market Letter, all of the information in the database is available to you.  The cost of the subscription is $75 for six months.

Around the world, there are people whose hobby is to collect information about Ferraris.  Many of those people freely share all of their information.  One such source is the Dino Registry.  Before the internet, the Dino Registry was available by phone or letter inquiry.  With the advent

of the Internet, all of the information in the Dino Registry is available for free with a simple Google search of "Dino Registry."

Ahlgrim also spoke to Ken Sterne, Bill Locke and Andy Cohen.

The value of a Ferrari is determined by a number of factors. There is a hierarchy of models within the Ferrari family. After the model, the next most important factor is whether it is in the original condition and the highest class is a car in the original condition that is in excellent condition.

The paint of a car is a more interesting question. There is a little more leeway the older a car is but the holy grail of cars is a car with the original paint that is in excellent condition. When you do have to repaint the car, a color change further diminishes the value of the car because anyone looking to purchase a car may be scared away because of the re-paint plus different color.

If a novice consumer wanted to get into buying cars, it is important to align yourself with and retain an expert. There are different responsibilities: you need an inspector who can look at the car and evaluate its components for originality and for condition; you also need an appraiser who is familiar with the market. An excellent appraiser may not have the qualifications to conduct a proper inspection.

The Ferrari Lusso is a 250 series car. Lusso means "luxury" in Italian. Only 350 were made in total so it is very rare. A correct original engine is one of the foundations of a car's value. A car's value tends to be based one-third on engine, one-third on chassis and one-third on body. A car without its original engine would dramatically decrease its value. Consumers' first question is often, "is this a matching number car" meaning "is this the original engine?"

The number on the car's engine is stamped on a boss, that is a piece of metal that sticks out of the engine block. Upon viewing the photo of the numbers stamped on the Lusso in this case, it immediately drew suspicion as an incorrect number. The first number "4" is not legible, the spacing is incorrect and all the numbers are not in a straight line. This means there was probably a "re-stamp" which is a counterfeit stamp and a counterfeit engine. Everything on the Lusso was about as top a quality as you can get and they are not going to put the numbers on the engine in a sloppy fashion.

Based upon reviewing the internal number of this Lusso, the engine was more of a pedestrian model and was not as rare and, therefore, not as valuable. Ahlgrim was able to trace

the location of the original engine.  There was also information available through the Ferrari Market Letter prior to 2007 that the car was at a car show in California and the people running the show determined the engine was probably a re-stamped engine.  The change in engine of a car such as a Lusso would dramatically decrease the number of people interested in purchasing a car.  Someone who can pay for a $300,000 car can probably afford a $350,000 and if 100 people are interested in a Lusso, maybe only 10 would have an interest in one with a re-stamped engine, so the market is greatly reduced and the only way to sell the car is to reduce the price.

Ahlgrim also learned that the Lusso was recently on the market for sale approximately six months before Henderson purchased it.

Ahlgrim opines that when Demars completed his inspection, he did not identify that the engine number stamping was suspicious and probably was a re-stamp.

Upon reviewing a photograph of the Dino, Ahlgrim can immediately tell that the color is not a true Ferrari color.  The Fly Yellow color of Ferrari is bright yellow and this car is more yellowish green.  It might be difficult to determine the color was not a Ferrari color by looking at the photo, but it would be immediately apparent to an expert that the color was not a Ferrari color upon a visual inspection of the car.

Ahlgrim looked at the Ferrari Market Letter and Dino Registry and both contained information that the car was originally blue.

Demars represented that the car was an original time capsule survivor.  But, the car had the wrong color and the seats had been repainted.  The car was not in original time capsule condition.  And, to truly change the color of the car, you have to remove the paint with sandpaper or other abrasive.  By doing that, there is a chance you are distorting the metal underneath.  Sometimes the filler between seams is removed during the sanding and is not replaced properly.  The repainting may also be thicker than the original painting which distorts the subtle lines in the car and makes the distinct lines in the car muted.  You also have to completely take the car apart – invasive surgery – and the car would never be the same.  This would never be a survivor car or a factory original car after a repainting.

Further, the fact that the seats had to be repainted is not consistent with the mileage of 6500 and is more likely due to excessive wear and tear.

Demars's inspections and appraisals were flawed and lacked diligence.  Demars advertised as being a consultant:  come to me; don't trust these dealers because they are going to

screw you.  Instead, he did not go out and properly inspect the car and was always in a hurry to close the deal.  Ahlgrim never relates his fee to the price of a car.  His fee is based upon the time he spends and the monies he expends in his efforts.

Ahlgrim does not believe that having the Dino and Lusso sold by Ken Sterne in Asheville, North Carolina and Andy Cohen in Beverly Hills, California, detracted from the sales price.  First, there are many affluent people in both those areas.  Secondly, most sales are now done through the internet.  Any car enthusiast would not be deterred from traveling to have the car inspected.

When cars are sold at auction, both the buyer and seller pay a 10% fee to the auction.  Thus, a purchaser of a $400,000 car must pay $440,000 and the seller of that same car only receives $360,000.  Plus, the seller incurrs the expense of shipping the car to the auction site.  There is no detriment to selling these cars at a dealer.

Ahlgrim believes the fair market value of the Dino in May 2007 was 20% less than Henderson paid for the car.

Ahlgrim believes the fair market value of the Lusso was affected by the replacement engine and the fair market value of Lusso was 20 – 25% less than Henderson paid for the car.

Ahlgrim believes the appraisal provided to Henderson by Demars, which valued the Dino at $300,000, is just fiction and that all Demars was doing was making up a number to make the buyer feel better.  Ahlgrim also believes an appraisal of $650,000 for the Lusso shortly after the purchase for $485,000 is a similar fiction.  An appraisal which represents that the car's engine number matches the chassis number is representing that the car contains the original engine.

**Edmund Waterman** was called as a witness by the Defendant.  Waterman owns Motor Car Gallery in Ft. Lauderdale since 1984.  The dealership buys and sells collectible cars.  Waterman first started working with classic cars in the late 1960's.  His dealership specializes in Italian cars, including Ferraris.  Ahlgrim is the general manager for Motor Car Gallery.

Waterman has known Demars for 30 to 35 years.  Waterman was involved in the sale of the Dino to Henderson.  Demars came to Waterman and said he had a client interested in purchasing a Dino.  Demars knew that Waterman usually had a couple of Dino's in stock.  Demars said he wanted a high quality 246 GTS Dino.  Waterman had a yellow Dino with tan interior and low mileage.  Waterman knew of the vehicle probably by seeing it advertised or talking to people in the field.  Henderson negotiated with the owner, Donald Williams, the owner

of Black Hawk Collection.  The seller was seeking $250,000 but he and the seller agreed on a purchase price of $190,000 to $195,000.

At the time, Waterman believed that the car had its original Fly Yellow color and relayed that information to Demars.  When Waterman saw the Dino, the quality of the paint on the Dino was excellent. He can't recall ever being told by Williams that the car was its original color, but that was Waterman's impression.

It would be highly unrealistic to expect a car as old as the Dino to have its original paint in excellent condition.  Thus, such a car would be so rare, Waterman would be willing to pay a premium for the vehicle.

Waterman has never used the term "time capsule original" so he would have never used that term to Demars in describing the car.  He may have used the term "survivor" to Demars.

Two years later, Waterman learned from Demars that the car was not the original color and Demars wanted to know what Waterman knew about that.  Waterman knew nothing about the color change.  However, when Waterman later learned that the car had previously been owned by Bill Locke, he knew the car had been blue because he knew Bill Locke and knew he owned the blue Dino. Knowing today that the car was not its original color, he might have bought it for the same price but only because it was being directly re-sold to Henderson.  If he were buying it for his inventory, he would have wanted to pay less.

The mileage of the car is an important factor to consider in buying a car and no one has ever contested the actual mileage of this Dino.

Waterman sometimes consults the Dino registry when investigating a car and only does not do so if he already has personal information about a car.  The last listed owner of this Dino on the Dino registry is G and S Motors.  There is no indication that the car was later sold to a sheikh.

Waterman had seen the Lusso at issue in this case prior to Henderson's purchase of it. He was not interested in purchasing the Lusso so only made a casual inspection of the car.

Waterman is familiar with the issue of re-stamping of Ferrari engines. The manufacturer's records for the Lusso are probably quite accurate.  It is unusual for a GTE engine to be placed in a Lusso but it is not unheard of.

The Ferrari market fluctuates quite a bit over the years.  The economic downturn did affect the market to some degree but not as much as the conventional automobile market.

Waterman believes that it is easier to sell a Dino in Fort Lauderdale than in North Carolina.   Waterman actually tried to buy the Dino from Sterne and characterized his presentation as thorough and factual.  He has never sold a car on EBay.

After he was hired as the Defendant's expert, he consulted the Dino registry.  As soon as he saw Bill Locke's name as a previous owner, he knew the car had been blue.  The search took less than 5 minutes.  Anyone consulting the Dino registry would have known the car had been blue within 5 minutes.  Anyone who is in the business of advising purchasers of Ferraris should consult with the Dino registry and with the Ferrari Market Letter.  All ads in the Market Letter must include the car's VIN number.

There were no other potential purchasers for the Dino and Waterman never told Demars that there was any need to hurry.

**Andrew Cohen's** testimony was presented by deposition designations.  For over twenty years he has owned Beverly Hills Sports and Classic Cars in Beverly Hills, California selling mainly vintage cars.

Henderson has been a client of his for five or six years.  Cohen was involved in selling Henderson's Lusso.  Henderson shipped the Lusso to California and upon its arrival Cohen conducted an inspection of the car.  Cohen has conducted hundreds of inspections of Ferraris over the years.   Upon his inspection, he noticed that the engine numbers looked funny, inconsistent.  The numbers were uneven and had different fonts.  The internal number the engine revealed that the engine is not the type of engine that is supposed to be in a Lusso.

Cohen conducted further research by consulting the Ferrari Market Letter and with Marcel Massini. Massini is a Ferrari historian.

Cohen believes the Lusso would have been worth $500,000 to $550,000 with the correct engine and is worth $400,000 to $450,000 with the wrong engine.

Cohen paid Henderson $400,000 for the car and re-sold the car to an entity, DK Engineering, in England. Cohen does not recall how much he received from the entity but knows that he made a profit.  He did notify the entity in England of the engine re-stamping.  Cohen believes that the market for the sale of Lussos in 2010 was a good market.

**William Locke's** testimony was presented by deposition designations.  Locke is a 65 year old former banker who has been involved in collecting cars for 30 – 35 years.  He is not a

dealer but has helped people sell their cars and has restored and collected cars himself.  He has shown cars at numerous Concours D'Elegance events.

Locke purchased the Dino at issue in this case in 1988 and sold it in 1993.  He purchased the car from Al Loson in Sodus Point, New York.  The color of the car was Dino blue metallic. Photographs of the blue Dino were introduced into evidence.  Locke kept extensive records of all of the information he learned about the car and its history.

In 1993, Locke sold the Dino to Jack Gale, an attorney in Ft. Pierce, Florida.  In 1994 or 1995, he saw the Dino at a Cavallino Classic car event and Gale had repainted the car from blue to yellow.  Even with a repainting of the car, some collectors might consider the car an original car because of the condition of the other components of the car.

**Kenneth Sterne's** testimony was presented by deposition designations.  Sterne owns G and S Motors in Arden, North Carolina.  His business buys and sells collectible cars and it specializes in buying cars for one particular client in the Middle East.  He has been in the collectible cars field for 7 years.  Most of his business is internet-based.  He has been involved in the sale of approximately 150 cars.

Sterne first met Henderson in 2010 and began selling cars for Henderson in 2011 because Henderson wanted to downsize his collection.  Sterne has sold three cars for Henderson.  He first sold a car of lesser value – probably as a test of his skills by Henderson – then sold the Dino for Henderson.  The first thing Sterne did was to check with the registries about the car.  The registry indicated that the car was originally blue but was later changed to yellow.  He found the name Locke associated with the car and Googled "Locke" and "Ferrari" and "Dino" and found an ad Bill Locke had placed in a Ferrari market letter.  He was able to contact Locke and obtained much information about the history of the Dino from Locke – including the fact that the car had originally been blue.

Sterne believes that if the Dino had its original color, it would have been worth $25,000 more.  Sterne was able to sell the Dino to a customer who is a sheikh in Dubai for $193,000. Sterne took a $5,000 commission and Henderson received $188,000.

## CONCLUSIONS BY THE COURT

*The Breach of Contract Claim:*

The Court first finds that the testimony of Henderson, Ahlgrim and Waterman was credible and upon reviewing the deposition designations of Cohen, Sterne and Locke, their testimony is also accepted by the Court.

The credible testimony and evidence overwhelmingly establish that irrespective of his qualifications, Demars did not perform the services he agreed to do under the Contract.

Under Florida law, in a breach of contract claim a plaintiff must show that: (1) there was a contract; (2) the defendant breached the contract; and (3) the plaintiff suffered damages as a result of the breach. *Rollins, Inc. v. Butland*, 951 So. 2d 860, 869 (Fla. 2nd DCA 2006).

The facts demonstrate that a contract existed between Henderson and DeMars. Specifically, Demars agreed to "locate and recommend" cars for Henderson to purchase. In exchange for those services, Henderson agreed to compensate Demars. Demars's claim that the Contract only obligated him to locate vehicles borders on the absurd. Demars bombarded Henderson with emails claiming that he was a "car detective" and he would provide a "bottom line recommendation of the vehicle's actual condition and mileage." The Contract clearly states in several places that Demars's obligation was to locate and "recommend" a car for Henderson. Demars would have to assess the condition of the vehicle and its fair market value so he could recommend to Henderson whether to purchase the car and the price offered.

Pursuant to the terms of the Contract and the documents describing the terms of the Contract, the "Auto Search" service included not only finding an automobile, but inspecting, diagnosing and determining the history of the car. With regard to the Dino, it is undisputed that the original color of the Dino was blue and not the "Fly Yellow" that Demars indicated was its original paint and color. Demars breached the terms of the Contract by failing to properly perform all of the services that he offered in exchange for the commission he received. The testimony of Plaintiff's expert, Steven Ahlgrim, as well as that of Kenneth Sterne demonstrated that determining the original color of the Dino was a surprisingly easy task, and one that should have been performed by Demars pursuant to the terms of the Contract. Anyone could have consulted the Dino registry on-line and found out in five minutes that the original color of the car was blue – not Fly Yellow. By subscribing to the Ferrari Market Letter for $75 for a six month

subscription, Demars could have obtained a full history of the Dino, including the fact that it was originally painted blue.  Demars's explanation for not knowing of the existence of the Dino registry and for not consulting the Dino registry ("I am not an Internet person") and for not continuing his subscription to the Ferrari Market Letter (no explanation) are  absurd for someone who in 2007 held himself out as the "World's Best Known Auto Appraiser."  Further, when asked what efforts he had made to verify the original color of the car, Demars testified that he solely relied on the representations of Waterman – the seller's agent – and did absolutely nothing to independently verify the information for his client even though his sales pitch to Henderson warned him that sellers were unscrupulous and could not be trusted.

With regard to the Lusso, based upon the testimony of Ahlgrim and Cohen, a knowledgeable auto appraiser should have easily detected the engine re-stamping, and that something was suspicious at the time of Demars's inspection.  Once suspicions were aroused, it was again quick and easy to learn (from a simple look at the internal number of the engine) that the engine was for a different model of Ferrari.

Based upon the evidence, the Court finds that DeMars breached the Contract by failing to provide the services that he agreed to perform in exchange for a fee.

If damages are shown to be causally connected to a breach of contract, and there is some reasonable yardstick for measuring them, even though the amount might not have been precisely contemplated, consequential damages are awardable as an element of damages.  A plaintiff in a breach of contract action is entitled to affirm the contract, insist on the benefit of his bargain, and seek those damages that will place him in the position he would have been in if the contract had been completely performed. See *McCray v. Murray*, 423 So2d 559, 561 (Fla. 1st DCA 1982). Under the benefit-of-the-bargain rule, damages are measured by the difference between the value of the property as represented and the actual value of the property on the date of the transaction. *Morgan Stanley & Co. Inc. v. Coleman (Parent) Holdings Inc.*, 955 So.2d 1124, 1128 (Fla. 4th DCA 2007).

In this matter, the expert testimony established that the purchase price paid by Henderson for each of the cars should have been reduced by at least 20%.  Thus, Henderson overpaid for the Dino by $41,000 (20% of $205,000) and overpaid for the Lusso by $97,000 (20% of $485,000).

The Court enters a verdict in favor of the Plaintiff Henderson and against the Defendant Demars in the amount of $138,000.  Henderson is entitled to interest from the date of purchase of each of the vehicles.

The Court finds that the Contract only allowed for the recovery of attorney's fees for any action for non-payment of services or expenses.  Thus, each party shall be responsible for his own attorney's fees and costs.

*The Florida Deceptive and Unfair Trade Practices Act Claim:*

Florida's Deceptive and Unfair Trade Practices Act (FDUTPA), Sections 501.201 *et seq.*, Florida Statutes, is intended to "protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." § 501.202(2). *See also Delgado v. J.W. Courtesy Pontiac GMC-Truck, Inc.*, 693 So. 2d 602, 605-06 (Fla. 2d DCA 1997) (discussing the purpose of FDUTPA in light of its legislative history).

A deceptive practice is one that is "likely to mislead" consumers. *Davis v. Powertel Inc.,* 776 So. 2d 971, 974 (Fla. 1st DCA 2000). An unfair practice is "one that 'offends established public policy' and one that is 'immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.'" *Samuels v. King Motor Co. of Fort Lauderdale*, 782 So. 2d 489, 499 (Fla. 4th DCA 2001) (quoting *Spiegel, Inc. v. Fed. Trade Comm'n*, 540 F. 2d 287, 293 (7th Cir. 1976)).

FDUTPA affords civil private causes of action for both declaratory and injunctive relief and for damages:

> In any action brought by a person who has suffered a loss as a result of a violation of this part, such person may recover actual damages, plus attorney's fees and court costs as provided in s. 501.2105.

A consumer claim for damages under FDUTPA has three elements: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages. See *Chicken Unlimited, Inc. v. Bockover*, 374 So. 2d 96, 97 (Fla. 2d DCA 1979); *Gen. Motors Acceptance Corp. v. Laesser*, 718 So. 2d 276, 277 (Fla. 4th DCA 1998); *Macias v. HBC of Fla., Inc.*, 694 So. 2d 88, 90 (Fla. 3d DCA 1997).

Although a FDUTPA claim "may arise from a single contract, this principle does not operate to convert every breach of contract into a claim under the Act," but instead reaches only that conduct which is unfair or deceptive. *Bookworld Trade, Inc. v. Daughters of St. Paul, Inc.,* 532 F. Supp. 2d, 1350, 1364 (M.D. Fla. 2007) (*citing PNR, Inc. v. Beacon Prop. Mgmt., Inc.,* 842 So. 2d 773, 777 n. 2 (Fla. 2003)).   Accordingly, a claim under FDUTPA is not defined by the express terms of a contract, but instead encompasses unfair and deceptive practices arising out of business relationships.

When considering whether a defendant's actions "support a finding of unfair methods of competition, unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce, 'courts have regarded the concept as extremely broad.'" *MJS Music Publ'n, LLC v. Hal Leonard Corp.,* No. 8:06-cv-488-T30EAJ, 2006 WL 1208015, at *2 (M.D.Fla. May 4, 2006) (*quoting Day v. Le-Jo Enters., Inc.,* 521 So. 2d 175, 178 (Fla. 3d DCA 1988)).

Additionally, in determining whether conduct violates FDUPTA, Courts should consider whether the Federal Trade Commission (FTC) and other federal courts deem conduct to be an unfair method of competition or an unconscionable, unfair or deceptive act or practice under federal law. *State of Fla., Office of Atty. Gen., Dept. of Legal Affairs v. Tenet Healthcare Corp*., 420 F.Supp.2d 1288, 1309-10 (S.D. Fla. 2005).   The FTC's own examples of what it considers deceptive practices are illustrative for the case at hand:

> Practices that have been found misleading or deceptive in specific cases include false oral or written representations, misleading price claims, sales of hazardous or systematically defective products or services without adequate disclosures, failure to disclose information regarding pyramid sales, use of bait and switch techniques, <u>failure to perform promised services</u>, and failure to meet warranty obligations.

*F.T.C. v. IFC Credit Corp.*, 543 F.Supp2d 925, 941 (N.D. Ill. 2008) (quoting FTC Policy Statement on Deception, at 3) (emphasis added). To establish that an act or practice is deceptive under the Federal Trade Commission Act (15 U.S.C. § 45(a)(1)), the FTC must establish that "(1) there was a representation, (2) the representation was likely to mislead consumers acting reasonably under the circumstances, and (3) the representation was material. A representation is material if it is of a kind usually relied upon by a reasonably prudent person." *F.T.C. v. Home Assure, LLC*, 2009 WL 1043956 at *18-19 (M.D. Fla. 2009) (*internal citations omitted*) (finding a "substantial likelihood" that FTC would prevail on claims that a self-declared "mortgage

foreclosure rescue service" engaged in deceptive acts or practices by falsely promising to help consumers stop pending or impending home foreclosure actions); *see also F.T.C. v. Klitco of Nevada, Inc.*, 612 F.Supp 1282, 1292 (D. Minn. 1985) (misrepresentations concerning expected benefits of an investment opportunity violate the Federal Trade Commission Act).

Henderson posits three deceptive and unfair practices utilized by Demars: he overstated his qualifications in his advertising, he failed to perform the services promised and he falsely claimed that Henderson's purchases had to be consummated quickly because other potential buyers were also looking at the cars.

Reviewing Demars's website as well as the materials sent to Henderson by Demars prior to entering into the Contract, the Court cannot find that any of Demar's claims as to his experience or expertise were false or deceptive or misleading.  He did have decades of experience and may have been considered by some as the best known appraiser.  Much of his claims were hyperbole - but not false.

Although the Court has already found that Demars breached the contract by failing to perform his obligations, there is no credible evidence that he entered the contract intending to fail to perform or that his failures were done with any intent to deceive Henderson.  At best, Henderson proved that Demars just wasn't very good or very thorough – not that he was unscrupulous.

Henderson claims that Demars made misrepresentations concerning the status of other potential buyers.  The Court credits Demars's explanation of these statements.  The Court has also considered the evidence that other cars bought by Henderson with Demars's recommendation were sold for a profit.

The Court hereby enters a verdict in favor of Demars and against Henderson on the FDUPTA claim.

The Court will enter a separate Final Judgment.

Done and Ordered this 20th day of March 2013.


ROBERT N. SCOLA, JR
UNITED STATES DISTRICT COURT JUDGE